NO. 07-08-0109-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL A

MAY 14, 2009
_____

MILO CRADALE WILLIAMS, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE
_____

FROM THE 320TH DISTRICT COURT OF POTTER COUNTY;

NO. 55,244-D; HONORABLE DON EMERSON, JUDGE
_____

Before CAMPBELL and HANCOCK and PIRTLE, JJ.

**MEMORANDUM OPINION**

Appellant, Milo Cradale Williams, appeals his conviction for the offense of murder and sentence of life imprisonment in the Institutional Division of the Texas Department of Criminal Justice. We affirm.

Background

On April 19, 2001, a Toot'n Totum clerk was shot and killed during the early morning hours while working at the Amarillo, Texas store. During the ensuing investigation, the

police spoke to witnesses, including Allison Reed, that described a four door sedan-type vehicle in the area and a tall black man who walked by while the witnesses were at a friend's house near the store. The crime scene investigators gathered a spent bullet shell casing as well as the store security videotape showing the killer wearing pantyhose over his face and carrying a small handgun. No weapon was found at the scene nor in the immediate vicinity. In the course of the investigation, police officers spoke with Notorry Graves who viewed a photo lineup and identified Sedrick Ryan as a possible suspect in the murder of the clerk. The police pursued the lead and eventually issued an arrest warrant for Sedrick Ryan. In serving the arrest warrant upon Ryan, the police gathered evidence from Ryan's home including hair samples and a pair of pantyhose but did not find a weapon. After interviewing Ryan and further investigating Graves's statement placing Ryan at the crime scene, the police determined that Ryan was not involved in the murder and released him. No other suspects were developed and the case went unsolved.

In 2006, Sargent Dockery began reviewing cold case files and reviewed the murder of this Toot'n Totum clerk. In reviewing the evidence, Dockery discovered that appellant's name had come up during the initial investigation but the lead had not been investigated further. Dockery reinterviewed witnesses and discovered that appellant had been in the area of the Toot'n Totum on the night of the murder. In speaking with D.J. Golden, Dockery learned that Golden, Charlie Meza, and appellant had stopped near the Toot'n Totum to pick up another friend. While they waited for this friend, appellant left the vehicle and was gone approximately five minutes. When appellant returned to the car, appellant instructed the others to "go, go, go" even though they did not meet with the friend they had

planned on meeting. Dockery also spoke with Meza who confirmed Golden's story. Additionally, Meza told Dockery that appellant had admitted to trying to rob the convenience store. Next, Dockery spoke with Dannie Mae Golden, who was dating appellant at the time of the murder. According to Dannie, she purchased clothing for appellant on occasion and specifically recognized the clothing of the murderer as the same type of clothing that she had purchased for appellant. During the cold case review, Officer Jimmy Rifenberg reviewed the videotape and noticed that the murderer appeared to have a birthmark behind his right ear. Rifenberg then reviewed a photograph of appellant and observed that appellant also had a mark behind his right ear. Finally, Dockery was able to verify through Meza's statement that appellant would have had access to a four door sedan similar to the one observed at the crime scene. With the additional information obtained during the cold case review, the police arrested and charged appellant with the murder.

At trial, the State informed the trial court that it wished to further develop the connection of appellant with a sedan similar to the car observed by witnesses on the night of the murder. Meza testified that, on the night of the murder, they were in a Thunderbird; additionally, Reed was shown a photograph of a Thunderbird and testified that it was similar to the vehicle she observed on the night of the murder. At this point, the State wished to present evidence that appellant had access to a Thunderbird. To do so, the State sought to enter testimony from Dockery that a Ford Thunderbird was used by appellant, Meza, and Golden to participate in a bank robbery approximately two weeks after the murder. Appellant objected to any mention of the subsequent bank robbery but

his objection was overruled. Based on the testimony of the witnesses and police officers as well as the physical evidence, the jury returned a verdict of guilty and the trial court sentenced appellant to confinement for life in the Institutional Division of the Texas Department of Criminal Justice.

Appellant raises three issues on appeal contending that the: 1) trial court erred in permitting references to appellant's participation in the subsequent bank robbery involving a Ford Thunderbird into evidence because such evidence was offered to prove appellant's character as a criminal; 2) trial court erred in permitting the references to appellant's participation in the bank robbery by driving a Ford Thunderbird because such testimony was more prejudicial than probative; and 3) evidence was factually insufficient to support the conviction for murder. We affirm.

Evidence of Other Bad Acts

Texas Rule of Evidence 404(b) prohibits the admission of evidence of extraneous offenses committed by the defendant for the purpose of proving that, on the occasion in question, the defendant acted in conformity with the character demonstrated by the other bad acts. See Santellan v. State, 939 S.W.2d 155, 168 (Tex.Crim.App. 1997). The rule also provides exceptions to this principle such as when evidence is admitted to show proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Id. If the opponent of extraneous offense evidence objects on the grounds that the evidence violates Rule 404(b), the proponent must satisfy the trial court that the extraneous offense evidence has relevance apart from its character conformity value. See

4

id.; Montgomery v. State, 810 S.W.2d 372, 387 (Tex.Crim.App.1990) (op. on reh'g). If the trial court determines the evidence has no relevance apart from supporting the conclusion that the defendant acted in conformity with his character, it is absolutely inadmissible. See Santellan, 939 S.W.2d at 169. On the other hand, extraneous offense evidence is admissible if the proponent persuades the trial court that the extraneous offense evidence tends to establish some elemental or evidentiary fact or that it rebuts a defensive theory. See id. at 168-69; Montgomery, 810 S.W.2d at 387-388. The trial court's determination of whether other bad act evidence has relevance apart from character conformity is reviewed for an abuse of discretion. See Guzman v. State, 955 S.W.2d 85, 89 (Tex.Crim.App. 1997) (the standard of review on a trial court's evidentiary ruling is an abuse of discretion standard); Montgomery, 810 S.W.2d at 394. As long as the trial court's ruling was within the zone of reasonable disagreement, there is no abuse of discretion and the trial court's ruling will be upheld. Santellan, 939 S.W.2d at 169. Once the trial judge has ruled on whether the evidence is relevant beyond its character conformity value, he has ruled on the full extent of the opponent's Rule 404(b) objection. Id. The opponent must then make a further objection based on Rule 403, in order for the trial judge to weigh the probative and prejudicial value of the evidence. Id. To exclude extraneous offense evidence under Rule 403, the opponent must specifically request a Rule 403 ruling. See Montgomery, 810 S.W.2d at 388.

In the instant case, appellant contends that the trial court erred in allowing Dockery and Golden to testify about appellant's participation in a subsequent bank robbery claiming that the State was seeking to admit the extraneous offense as evidence of appellant's bad

character. However, the State sought Dockery's testimony because "[t]hat connects [appellant] to that type of vehicle, which is the same type of vehicle that was seen at – located at the scene that night. And that's the purpose of getting into that." The State further elaborated that it sought the testimony regarding the bank robbery as evidence tying appellant to Golden and Meza, both of whom testified they were with appellant on the night of the murder. The record shows that the trial court heard the contested testimony outside of the presence of the jury. Before making a ruling on Dockery's testimony, the trial court heard testimony from Golden relating to the bank robbery, appellant's participation as a driver in the robbery, as well as testimony related to the vehicle itself. After hearing both Dockery's and Golden's testimony, the trial court judge took a recess to consider the admissibility of the evidence before allowing Dockery's and Golden's testimony.[1] During Golden's testimony, Golden stated that appellant drove them to the bank in a Thunderbird. The State showed Golden a photograph taken of the Thunderbird used in the robbery which Golden identified as being the same vehicle that appellant had driven. That was the same photograph that Reed had earlier testified as similar to the vehicle she had seen parked near the Toot'n Totum at the time of the murder. Meza also identified the photographed vehicle as the vehicle that Golden, Meza, and appellant had used on the night of the murder. Next, the State had Dockery testify as to the foundation of the photograph of the vehicle recovered during the investigation of the bank robbery. The State sought to admit the factual resume from the federal robbery case; however, upon review of the document, the trial court informed the State that it wished the resume

---

[1]Appellant preserved his objection by requesting and receiving a running objection to both Golden's and Dockery's testimony of appellant's participation in the robbery.

redacted because "what we're trying to keep out of here is evidence at this point of other bad acts." Upon closer consideration of the document, the trial court suggested that the document not be offered at all, but that Dockery instead simply testify to the portion of the facts that appellant drove the others to the bank that they robbed. The State accepted the court's suggestion and only offered Dockery's recitation of the facts from the resume.

From the record, it is apparent that the trial court deliberated on appellant's objection. Further, the court acted as to limit the references to appellant's participation in the bank robbery to the sole issue of appellant's participation in the bank robbery as a driver of a Thunderbird. From its actions, it would appear that the trial court accepted the State's explanation that connecting the vehicle from the robbery to the vehicle observed at the murder scene was probative evidence because it placed appellant at the scene near the time of the murder. Therefore, the State satisfied the trial court that the extraneous offense evidence had relevance apart from its character conformity value. See Santellan, 939 S.W.2d at 169; Montgomery v. State, 810 S.W.2d at 387. Additionally, the connection of appellant with a sedan-type vehicle could have been relevant as to both identity and opportunity. See Martin v. State, 173 S.W.3d 463, 467 (Tex.Crim.App. 2005) (trial court ruling is to be upheld if the ruling is correct on any theory of law applicable to the case). Therefore, we conclude that the trial court's decision was within the zone of reasonable disagreement and, thus, will not overturn the trial court's decision.

Once the trial judge has ruled on whether the evidence is relevant beyond its character conformity value, he has ruled on the full extent of the opponent's Rule 404(b) objection. Santellan, 939 S.W.2d at 169; Montgomery, 810 S.W.2d at 388. The opponent

7

must then make a further objection based on Rule 403 in order for the trial judge to weigh the probative and prejudicial value of the evidence. Id. To exclude extraneous offense evidence under Rule 403, the opponent must specifically request a Rule 403 ruling. See Montgomery, 810 S.W.2d at 388. In the instant case, appellant did not make a Rule 403 objection; therefore, we conclude that appellant waived this objection. Id.

Factual Sufficiency

In a factual sufficiency review, we must consider all of the evidence in a neutral light to determine whether a jury was rationally justified in finding guilt beyond a reasonable doubt. See Watson v. State, 204 S.W.3d 404, 415 (Tex.Crim.App. 2006). The appellate court views the evidence in a neutral light and asks whether the evidence supporting the verdict is so weak or so against the great weight and preponderance of the evidence as to render the verdict manifestly unjust. See Steadman v. State, No. PD-131-08, 2009 WL 838550, at *4 (Tex.Crim.App. April 1, 2009). A wrong and unjust verdict includes instances in which the jury's findings "shocks the conscience," or clearly demonstrates bias. See Grotti v. State, 273 S.W.3d 273, 280 (Tex.Crim.App. 2008). In doing a factual sufficiency review, the appellate court must be mindful that a jury has already passed on the facts and must give due deference to the determinations of the jury. See Lancon v. State, 253 S.W.3d 699, 704-05 (Tex.Crim.App. 2008). If the verdict is set aside, the court of appeals's opinion should clearly explain how the evidence supporting the verdict is too weak on its own or how the contradicting evidence so greatly outweighs the evidence in support of the verdict. See id. Further, if a court of appeals upholds a verdict, it is required to consider the most important evidence that the appellant claims undermines the

jury's verdict and explain why it does not have the persuasive force that the party believes is sufficient to overturn the verdict. See Sims v. State, 99 S.W.3d 600, 603 (Tex.Crim.App. 2003).

Appellant's contention is that there was insufficient evidence focusing on what was not presented to the jury. Appellant states that no evidence of a weapon, fingerprints, or eyewitnesses at the scene of the crime was presented to the jury. Appellant further comments on the poor quality and grainy nature of the videotape and the difficulty of the video expert and officers in making a positive identification. Finally, appellant attempts to discredit the testimony of Dannie Golden, D.J. Golden, and Meza as unreliable and contradictory.

Viewing the evidence in a neutral light, it is true that there was no murder weapon found or useable fingerprints in the store. However, the recovered spent casing was identified as .25 caliber. D.J. Golden testified that appellant carried a .25 caliber gun. Appellant contends no eyewitness places him in the store at the time of the murder. However, both Golden and Meza stated that they were parked outside of the store waiting for a friend at the time of the murder. Both Golden and Meza stated that appellant left the vehicle for a short while. Also, Reed observed a sedan-type vehicle parked outside the store on the night of the murder. Golden testified that, when appellant got back to the car, he told them to "go, go, go." Meza further testified that appellant later told him that appellant had tried to rob the store. Appellant's contentions are within the purview of the jury's determinations. See Lancon, 253 S.W.3d at 705. The jury was in the best position to judge the credibility of the witnesses because it was present to hear the testimony and

9

observe the demeanor of the witnesses as opposed to an appellate court who relies on the cold record. Id. Because the jury is the sole judge of a witness's credibility and the weight to be given the testimony, it may choose to believe some testimony and disbelieve other testimony. Id. at 707. Although appellant is correct that no eyewitness placed appellant inside the store, there is sufficient evidence when viewed in a neutral light, if believed by the jury, that appellant was in the vicinity of the murder and attempted to rob the store.

Next, on the issue of the videotape, Dannie Golden reviewed the videotape from the store and testified that the person on the video wore clothing similar to the clothing she had purchased for appellant. Rifenberg also reviewed the tape and observed a birthmark on the murderer's neck. However, on cross-examination, Rifenberg did acknowledge that background noise may increase when the photograph is enlarged. Appellant contends that the background noise could present an image of a birthmark on the neck of the murderer as seen in the video, but, in actuality, the birthmark may not exist. During trial, appellant was asked to stand up and the jury observed appellant had a birthmark behind his right ear. Again, the jury is the sole judge of a witness's credibility and the weight to be given the testimony. Id.

Even though no weapons or useable fingerprints were found at the crime scene, the videotape may be of poor quality, and the witnesses had contradictions in their testimony, there was sufficient evidence, when viewed in a neutral light, for a jury to be justified in finding appellant guilty beyond a reasonable doubt. In viewing all the evidence in a neutral light, we cannot state with an objective basis that the great weight and preponderance of

10

the evidence contradicts the jury's verdict.  <u>Grotti</u>, 273 S.W.3d at 283.  We must, therefore, defer to the jury's verdict.  We overrule appellant's third issue.

For the foregoing reasons, we affirm the judgment of the trial court.


Mackey K. Hancock
Justice


Publish.

11